Brian S. King, #4610
**Brian S. King, Attorney at Law**
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorney for Plaintiffs

# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| **RICHARD G., SUZANNE G. and LISA G.,** | : | |
| | : | |
| Plaintiffs, | : | AMENDED COMPLAINT |
| | : | |
| vs. | : | |
| | : | Civil No. 1:14-CV-00010 DBP |
| **SPACE SYSTEMS/LORAL, LLC,** | : | |
| | : | |
| Defendant. | : | |

Richard G. ("Richard"), Suzanne G. ("Suzanne"), and Lisa G. ("Lisa") (collectively, "the G. family"), through their undersigned counsel, complain and allege against Defendant Space Systems/Loral, LLC as follows:

### PARTIES, JURISDICTION AND VENUE

1. Richard, Suzanne, and Lisa are natural persons residing in Santa Clara County, California. Richard and Suzanne are Lisa's parents.

2. Space Systems/Loral, LLC is a corporation doing business throughout the world. Space Systems/Loral, LLC is Richard's employer.

3. Space Systems/Loral, LLC sponsors and funds a group health benefit plan ("the Plan") for its employees and their dependents. Richard is a participant in the Plan and Lisa is a beneficiary of the Plan.

4. Connecticut General Insurance Company ("CG") acted as the third party administrator for the Plan, processed the Plaintiffs' claims for coverage, and corresponded with the Plaintiffs during the prelitigation appeal process.

5. The Plan is an employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA").

6. Lisa received medical care and treatment in the State of Utah at Island View Residential Treatment Center ("IVRTC"), a residential treatment facility providing mental health care to adolescents, aged thirteen to eighteen.

7. The Plan denied some of Lisa's claims for payment of her medical expenses in connection with her treatment at IVRTC.  This lawsuit is brought to obtain this Court's order requiring the Plan to pay Lisa's unpaid expenses incurred during her treatment at IVRTC.

8. This Court has jurisdiction of this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

9. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) because the medical treatment at issue in this case was provided in the State of Utah, and CG does business in the state of Utah. In addition, the financial obligations of the Plaintiffs to Lisa's healthcare providers were incurred in the state of Utah.  Based on ERISA's nationwide service of process provision and 28 U.S.C. § 1391, venue is appropriate in the state of Utah.

10. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due and pursuant to 29 U.S.C. § 1132(a)(1)(B), an award of prejudgment interest and an award of attorney fees and costs pursuant to 29 U.S.C. § 1132(g).

## FACTUAL BACKGROUND

### Lisa's Developmental and Medical Background

11. Lisa is one of three triplets conceived via artificial insemination with an anonymous sperm donor.  She was 4 pounds eight ounces at birth and had a low body temperature and feeding problems after birth.  She quickly gained strength and met developmental milestones, although she was shy as a young child and required speech therapy in early elementary school.

12. Lisa became more outgoing as she went through elementary school and was quite popular with peers.  However, as she moved into middle school, she began to have problems with bullying and poor impulse and anger control.

13. Lisa's maternal family has a fairly significant history of bipolar disorder and some borderline features.  Nothing is known about Lisa's biological father.

14. Lisa began experiencing severe depression around the same time she entered middle school.  Lisa attempted suicide in 2008, which led to an inpatient hospitalization.  She was diagnosed with Bipolar Disorder during that hospitalization.

15. Lisa demonstrated frequent anger, throwing things, hitting and scratching, and was stealing from her family members.  She was also experimenting with drugs and alcohol and was engaging in promiscuous sexual behavior.  She also began engaging in cutting behaviors.

16. Prior to her admission at IVRTC, Lisa had been hospitalized twice, was in an intensive outpatient program for two to three months in 2010, and was in a wilderness program for two to

three months in 2010. The wilderness program recommended continued treatment in a residential treatment facility with a high level of supervision.

17. Lisa was exhibiting symptoms of anxiety, eating disordered behavior, ADHD, self harm, and hypersexual behavior.

## Lisa's Treatment at IVRTC

18. Lisa was admitted at IVRTC on November 30, 2010 and was diagnosed as follows:

     AXIS I          296.90 Mood Disorder, NOS
                     300.00 Anxiety Disorder, NOS
                     V61.20 Parent Child Relational Problem
                     305.20 R/O Cannabis Abuse
     AXIS II         Deferred
     AXIS III        R/O Sexually Transmitted Diseases, Tinea Pedis by Report
     AXIS IV         Severe Secondary to Family and Peer Conflict
     AXIS V          Current GAF: 35[1]  Highest GAF Past Year: approximately 50

19. Lisa was angry about being placed at IVRTC and demonstrated very limited insight into her moods. She continued to engage in self-harm behaviors for months after her admission. She was put on precaution status repeatedly, where staff would monitor her activities and status every fifteen minutes. She also continued to struggle with anxiety and was unable to articulate what she needed. Lisa was minimally engaged in therapy, refusing to provide specific information about concerns. In group therapy and milieu settings, Lisa was defensive and would quickly escalate, yelling and screaming at peers and then isolating herself in her room.

---

[1] G.A.F., or global assessment of functioning, was developed as a tool for mental healthcare providers to assess the overall level of functioning and ability to carry out activities of daily living for their patients. There is a separate scale utilized when the patient is an child or adolescent. A GAF of 35 on the child's global assessment scale indicates "Major impairment in functioning in several areas and unable in function in one of these areas, i.e., disturbed at home, at school, with peers, or in the society at large, e.g., persistent aggression without clear instigation; markedly withdrawn and isolated behavior due to either mood or thought disturbance, suicidal attempts with clear lethal intent. Such children are likely to require special schooling and/or hospitalization or withdrawal from school (but this is not a sufficient criterion for inclusion in this category."

20. Lisa became a bit more open about reporting and did identify possible visual hallucinations but additional testing did not indicate psychosis.  She continued to experience extreme mood lability, along with feelings of helplessness and hopelessness.  Lisa perceived herself as a victim and had very poorly developed skills in connection with getting her emotional needs met.  Lisa struggled with social skills and perceived that others were mistreating her.  However, objective review indicated that the perceived mistreatment was a result of perceptual dysfunction and not a reflection of reality.

21. At the time of her discharge on January 3, 2012, Lisa had made significant progress.  She was learning to manage her moods and had developed skills to help with her anxiety, to interact with others, take accountability for her own choices and behaviors, and develop a more positive way of thinking.  Her self-harm urges and behaviors had declined.  However, the clinical team did not believe that Lisa was ready for transfer to home after her discharge.  The recommendation was for Lisa to transfer to a step-down program for further intensive treatment.

### The Plan's Denial of Coverage and the G. Family's Appeals

22. Claims were submitted to CG and coverage for treatment was approved through February 24, 2011.  However, claims after February 24, 2011 were denied on the basis that Lisa's conditions did not meet criteria for residential treatment.

23. Richard and Suzanne appealed the denial of coverage on March 5, 2012.  In their appeal, Richard and Suzanne provided a detailed history for Lisa and included, among other things, a recommendation for treatment from the wilderness program, and precaution notes from IVRTC indicating that Lisa was continuing to engage in self-harm behaviors after February 24, 2011.

24. CG maintained the denial on behalf of the Plan on March 31, 2012.  The denial provided the same bases as before:  Lisa's conditions did not meet criteria for residential treatment and therefore, under the terms of the Plan, the treatment was not medically necessary and was not covered.

25. The G. Family requested an external review on August 20, 2012, and the external reviewer determined that claims for treatment through June 30, 2011 should be paid.  The external reviewer upheld denial of coverage for dates after July 1, 2011.

26. The denial of benefits after July 1, 2011, was a wrongful denial of benefits requiring the G. family to incur medical expenses that should have been paid by the Plan.

## CAUSE OF ACTION
### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

27. ERISA imposes higher-than-marketplace quality standards on ERISA plan fiducaries.  It sets forth a special standard of care upon a plan fiduciaries such as CG, acting an the agent for the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan.  29 U.S.C. §1104(a)(1).

28. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials.  29 U.S.C. §1133(2).

29.  The Plan, through its agent, CG, breached its fiduciary duties to Lisa when it failed to comply with the obligations outlined in 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in Lisa's interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries and to provide a full and fair review of Lisa's claims.

30. The actions of the Plan, through CG, in failing to provide coverage for Lisa's medically

necessary treatment at IVRTC are a violation of the terms of the Plan and CG's medical necessity criteria.

31. The actions of the Plan, through CG, as outlined above, have caused damage to Richard, Suzanne, and Lisa, in the form of denial of payment for medical services from July 1, 2011 through her discharge on January 3, 2012 rendered to Lisa totaling $72,864.00.

32. The Plan is responsible to pay Lisa's medical expenses as benefits due under the terms of the Plan together with prejudgment interest pursuant to U.C.A. §15-1-1, attorney fees and costs pursuant to 29 U.S.C. §1132(g).

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the amount of $72,864.00, the total amount that is owed for Lisa's medically necessary treatment at IVRTC under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

3. For such further relief as the Court deems just and proper.

DATED this 14th day of April, 2014.

By    s/ Brian S. King
       Brian S. King
       Attorney for Plaintiffs

Plaintiffs' Address:

Santa Clara County, California.